**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAKSIM BOLYASNYY and<br>ANTAR'S AMAZING DREAM FARM, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MASSACHUSETTS THOROUGHBRED<br>BREEDERS ASSOCIATION, INC.,<br>ARLENE BROWN, DAVID CRAMER,<br>DONNA PEREIRA, ARMAND JANJIGIAN,<br>GREGG ROSE, ANTHONY SPADEA JR.,<br>OLIVER KEITHLY, and PAUL UMBRELLO,<br><br>Defendants. | CIVIL ACTION NO. ____________ |

**<u>COMPLAINT AND JURY DEMAND</u>**

1. This action arises from the administration of a 2026 thoroughbred breeding incentive program by Defendant Massachusetts Thoroughbred Breeders Association, Inc. (the "MTBA"). Plaintiffs Maksim Bolyasnyy ("Bolyasnyy") and Antar's Amazing Dream Farm, LLC ("Antar's Farm") operate a commercial thoroughbred breeding business in Sherborn, Massachusetts and in 2025 brought Danzing Candy, a nationally recognized stallion, to Massachusetts and later decided to stand him at stud there. The program offered up to $25,000 to qualifying stallion owners and up to $15,000 to owners of qualifying mares – incentives capable of changing the economics of competing for mares and breeding business.

2. On August 27, 2025, the MTBA board voted on guidelines that the minutes state would be posted on the MTBA website and closed to applications only if the response became overwhelming. In October, MTBA directors David Cramer and Paul Umbrello knew Danzing Candy was in Massachusetts, visited Antar's Farm, discussed Plaintiffs' breeding prospects and

MTBA promotional assistance, and told Bolyasnyy that Plaintiffs could expect mares, but did not disclose the incentive program.

3. In November and December 2025, Bolyasnyy was actively considering the purchase of mares already in foal. Access to substantial mare and breed-back incentives would have changed Plaintiffs' acquisition strategy and how they marketed Danzing Candy.

4. After independently learning of the program, Bolyasnyy asked Cramer for the operative terms, allocation process, dissemination process, and recipients. Cramer then stated that the available stallion funds had been allocated and approved by the board, that Plaintiffs had missed the opportunity to participate, and later supplied a more restrictive version with a five-stallion cap, a September 15 allocation date, and additional eligibility criteria.

5. The available MTBA records do not establish that all five stallion awards were approved and allocated by September 15. The August 27 minutes identify no such deadline and instead contemplate website posting and later closure of applications; MTBA materials reflect application review in October, and the MTBA later discussed paying the disputed $25,000 Danzing Candy incentive in March 2026.

6. Plaintiffs allege that the MTBA and certain directors used selective disclosure, shifting criteria, preferential access, and conflicted administration to direct incentives and breeding opportunities toward incumbent or favored interests, including director-affiliated interests, while Plaintiffs competed without equivalent information or access.

7. As a result, Plaintiffs lost incentive opportunities, mare placements, stud fees, farm revenue, and goodwill and seek relief under federal and Massachusetts law.

**PARTIES**

8. Plaintiff Maksim Bolyasnyy is an individual residing in Massachusetts. Bolyasnyy is a member of the MTBA, individually owns Danzing Candy and Antarah, and conducts commercial thoroughbred breeding activities individually and through Antar's Farm.

9. Plaintiff Antar's Amazing Dream Farm, LLC is a Massachusetts limited liability company with its principal place of business at 101 Woodland Street, Sherborn, Massachusetts. Antar's Farm operates Plaintiffs' commercial thoroughbred breeding and farm-services business.

10. Defendant Massachusetts Thoroughbred Breeders Association, Inc. is a Massachusetts nonprofit agricultural industry association organized under Section 501(c)(5) of the Internal Revenue Code and headquartered at 30 Perry Lane, Weston, Massachusetts.

11. Defendants Arlene Brown, David Cramer, Donna Pereira, Armand Janjigian, Gregg Rose, Anthony Spadea Jr., Oliver Keithly, and Paul Umbrello served as directors, officers, or representatives of the MTBA during relevant portions of 2025 and 2026.

12. Brown, Cramer, Pereira, Janjigian, Rose, Spadea, and Umbrello are, on information and belief, Massachusetts residents. Keithly is a Maine resident who served as an MTBA director and participated in MTBA matters concerning Massachusetts breeding activity.

13. Cramer and Umbrello communicated directly with Plaintiffs concerning Danzing Candy, Plaintiffs' breeding plans, and the 2026 incentive program. Keithly later participated in MTBA communications and discussions concerning Plaintiffs' disputed $25,000 stallion incentive.

14. Brown, Cramer, Pereira, Janjigian, Rose, Spadea, Keithly, and Umbrello are referred to collectively as the "Director Defendants." Plaintiffs seek to impose individual liability

to the extent each Defendant personally participated in, authorized, ratified, or implemented the conduct alleged below.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over Plaintiffs' Sherman Act claim under 28 U.S.C. §§ 1331 and 1337(a), 15 U.S.C. § 1, and the private right of action provided by 15 U.S.C. § 15.

16. This Court has supplemental jurisdiction over Plaintiffs' Massachusetts claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal antitrust claim.

17. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and may grant other relief authorized by the statutes and common law invoked below.

18. The Court has personal jurisdiction over the MTBA and the Massachusetts-resident Director Defendants because they reside in, are organized in, or transacted the challenged business in Massachusetts. The Court has personal jurisdiction over Keithly because he served as a director of a Massachusetts association and allegedly participated in Massachusetts breeding activity and MTBA program decisions directed toward Massachusetts commerce.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in Massachusetts, the MTBA is headquartered in this District, Plaintiffs operate their farm in this District, and the 2026 program concerned Massachusetts breeding activity.

20. The challenged conduct occurred in and affected interstate commerce. Thoroughbred stallions, mares, owners, breeders, and related payments regularly moved between

Massachusetts and other states. Danzing Candy came to Massachusetts after standing in California, MTBA directors and program participants had racing or breeding interests in other states, and Plaintiffs later arranged for Danzing Candy to stand in Ohio during the 2027 breeding season.

## FACTS

### The MTBA and the 2026 breeding incentive program

21. Under G. L. c. 128, § 2(g), the Commonwealth uses cash incentives through the Massachusetts Thoroughbred Breeding Program to promote, develop, and encourage thoroughbred breeding in Massachusetts. The MTBA functions within that scheme and exercised discretion over the 2026 program's terms, publication, application procedures, eligibility criteria, recipients, allocations, and promotional channels.

22. The MTBA's bylaws vest management of its affairs in its Board of Directors, require directors to have a financial interest in thoroughbred racing or farm services, require freedom from conflicts of interest, and require a two-thirds vote of a quorum for expenditures exceeding $5,000.

23. On August 27, 2025, the MTBA held a board meeting in Dedham, Massachusetts. The minutes identify Brown, Cramer, Janjigian, Pereira, Rose, Spadea, and Umbrello as present.

24. Under "Old Business," the minutes state that the "Breeding Program 2026" incentive guideline was presented and voted on. Rose moved to accept the guidelines, and Janjigian seconded the motion.

25. The same minutes state that the incentive guideline "will be posted on the website" and that, "[i]f the response becomes overwhelming it will be removed and applications closed."

26. The minutes do not identify September 15, 2025 as a predetermined deadline for all stallion allocations.

27. One version of the 2026 program later provided to Bolyasnyy by a former MTBA board member (the "First Version") offered a $25,000 incentive to a qualifying stallion arriving before February 1, 2026 and substantial incentives for qualifying mares brought into Massachusetts, including breed-back payments tied to Massachusetts stallions. The First Version did not state that stallion awards were limited to five or had been fully allocated by September 15, 2025.

28. A different version later supplied by Cramer (the "Second Version") stated that the Board had approved only five stallions and that all five allocations had been made by September 15, 2025. It also imposed additional eligibility restrictions, caps, and preferences that did not appear in the First Version. Unlike the First Version, the Second Version also required broodmares to arrive before December 15, 2025, without providing a reduced incentive for later-arriving mares.

29. Those differences directly affected whether Plaintiffs could seek the $25,000 Danzing Candy incentive, obtain mare-related incentives, and use the program to attract breeding and farm-services business.

**Plaintiffs bring Danzing Candy to Massachusetts**

30. In October 2025, Bolyasnyy acquired Danzing Candy and initially brought him to Antar's Farm while considering whether to stand him outside Massachusetts. Bolyasnyy previously acquired Antarah in March 2025.

31. Danzing Candy had competed at a high level, including in the Kentucky Derby, had produced more than 300 foals, including California champions, and had progeny earnings

exceeding $7,000,000. Plaintiffs expected him to be a meaningful new competitive presence in Massachusetts breeding.

32. Danzing Candy arrived at Antar's Farm on or about October 13, 2025. On or about October 18, 2025, Bolyasnyy informed Cramer that Danzing Candy had arrived.

33. Before and after Danzing Candy's arrival, Cramer and Umbrello discussed Plaintiffs' breeding plans with Bolyasnyy. During the October farm visit, Cramer told Bolyasnyy that Massachusetts had approximately fifty mares, that Danzing Candy could expect approximately eleven mares, and that the MTBA would support his breeding efforts. Based in part on those discussions, Bolyasnyy decided to keep Danzing Candy in Massachusetts rather than stand him outside the Commonwealth.

34. Cramer and Umbrello visited Antar's Farm in or about the second half of October 2025. In discussing Plaintiffs' prospects for attracting mares and the MTBA's promotional assistance, they omitted the recently approved incentive program, even though its mare and breed-back payments directly affected the breeding decisions they were discussing. During that visit, Bolyasnyy also told Cramer and Umbrello that Antar's Farm could accept outside mares for boarding and foaling and was prepared to provide those services.

35. Neither told Bolyasnyy that the MTBA had approved substantial stallion and mare incentives, that a five-stallion cap supposedly existed, that all stallion funds supposedly had already been allocated by September 15, or that Plaintiffs needed to submit an application immediately to preserve any opportunity to participate.

36. Plaintiffs also asked MTBA representatives to assist with promotion of Danzing Candy and an open house at Antar's Farm. The MTBA did not provide a membership email list,

directed Plaintiffs toward more limited promotional channels, and Cramer and Umbrello requested that Plaintiffs postpone the planned open house on multiple occasions.

37. On information and belief, the MTBA did not meaningfully promote Danzing Candy or Plaintiffs' open house while other stallions, farms, or breeding opportunities received greater program-related exposure or assistance.

38. The omission of the incentive program had significant commercial effects. A mare owner who knew that substantial MTBA payments were available for bringing a mare into Massachusetts and breeding back to a Massachusetts stallion had a direct economic reason to choose a participating Massachusetts stallion and farm. Bolyasnyy also discussed breeding two mares to Danzing Candy with a prospective mare owner, but the anticipated breeding did not proceed after she learned that MTBA incentives would not be available.

**Plaintiffs were actively pursuing mares while the program remained relevant**

39. Plaintiffs were actively expanding their broodmare operation during the fall of 2025 while the 2026 program remained commercially relevant. On November 18, 2025, Bolyasnyy discussed breeding strategy with a bloodstock consultant, including his interest in acquiring mares in foal, and separately asked about a specific mare as a potential acquisition.

40. Bolyasnyy continued evaluating broodmares at November and December sales and ultimately purchased two mares that were not in foal at a December auction, without knowing of the MTBA incentives. Had Plaintiffs known that qualifying mares could generate substantial immediate payments and breed-back incentives, that information would have changed their acquisition strategy.

41. Even after December 15, the First Version stated that reduced mare incentives remained available, and Danzing Candy satisfied its stated February 1 arrival requirement for the

$25,000 stallion incentive. Plaintiffs were ready and able to submit the required paperwork. On February 6, 2026, Bolyasnyy told Cramer and Umbrello that he was considering bringing mares in foal to Antar's Farm and breeding them back to Danzing Candy and asked for the program terms and selection information.

**<u>The MTBA gave Plaintiffs inconsistent and incomplete explanations</u>**

42. After Bolyasnyy independently learned that a 2026 incentive program existed, he asked Cramer for the operative program, the approval and allocation process, how the program had been disseminated, and the identities of stallion recipients.

43. Cramer represented to Bolyasnyy, in substance, that the MTBA had limited funding, that the available stallion funds had been allocated and approved by the board before the MTBA met Plaintiffs, and that Plaintiffs had missed the opportunity to participate.

44. Cramer also questioned the accuracy of the information Bolyasnyy had received from outside the board and stated that the board could explain the program to him.

45. On February 11, 2026, Cramer told Bolyasnyy that he was "getting details from [the] board." On February 12, Cramer stated that he had the information but needed to "confirm one thing" because he did not want to send "misinformation."

46. On February 13, 2026, Cramer sent the Second Version and represented that it was the program "as it was presented and approved by the board."

47. Available MTBA records do not establish that all five stallion awards were approved and funded by September 15, 2025. The August 27 minutes record approval of guidelines, planned website publication, and possible program closure only if response became overwhelming, not a fixed September 15 exhaustion date.

48. Available MTBA materials reflect that application summaries were reviewed on or about October 16, 2025, approximately one month after the September 15 date later supplied by Cramer. Despite requests to counsel, Plaintiffs have not located a contemporaneous board record establishing the restrictive account later supplied by Cramer as the complete operative program as of September 15.

49. Bolyasnyy regularly reviewed the MTBA website during the summer and fall of 2025 and did not see the 2026 program. He also commissioned information-technology research indicating that the program was not meaningfully available on the website. If the guidelines were posted at all, they were not reasonably available for a meaningful application period.

50. The MTBA controlled the operative guidelines, application process, board records, recipient information, and payment records. Plaintiffs could not independently determine which version governed, when each award was approved, or why other participants received information and benefits that Plaintiffs did not.

**Conflicted interests and preferential program benefits**

51. The 2026 program distributed direct financial benefits and, through mare and breed-back incentives, could direct private breeding business toward particular stallions and farms. Bolyasnyy was later told by an MTBA insider that the Board determined which participants received mares in connection with the 2026 program.

52. The MTBA's bylaws simultaneously required directors to possess financial interests in thoroughbred racing or farm services. Certain Director Defendants therefore had private commercial interests in the same market whose incentive access and promotional opportunities they helped administer.

53. Cramer owned thoroughbred racehorses directly and in partnership with Spadea and participated in Massachusetts breeding activity involving mares and foals.

54. On information and belief, Umbrello participated in Massachusetts breeding activity involving mares and foals and maintained breeding arrangements or affiliations extending to Pennsylvania.

55. Keithly owned or controlled at least two stallions and engaged in private racing and breeding activities independent of his MTBA role. On information and belief, his commercial interests benefited from mare incentives, breed-back requirements, and stallion-owner awards tied to resulting progeny.

56. Available breeding and ownership records reviewed by Plaintiffs for thirteen mares or foals associated with the 2026 season identified six with connections to Keithly or his commercial network, including three foals sired by stallion Long On Value.

57. Available records support the inference that a substantial share of incentive-supported breeding business flowed toward director-affiliated or favored interests, including Keithly's commercial network, while Plaintiffs lacked comparable program access and Danzing Candy received little meaningful third-party breeding business. Antar's Farm likewise received little meaningful third-party foaling or related farm-services business associated with the 2026 program.

58. On information and belief, other program participants acquired mares in foal during October, November, and December 2025, after the date later asserted for exhaustion of stallion funding and while Plaintiffs were considering similar acquisitions without meaningful access to the program. Informed participants therefore could act on program incentives during

the same period Plaintiffs were making comparable breeding decisions without access to equivalent information.

59. On March 18, 2026, after Keithly invited Bolyasnyy to an MTBA board meeting, Bolyasnyy wrote that he expected an update concerning the $25,000 Danzing Candy incentive and intended to raise the program's lack of transparency and diversion of mares from Danzing Candy.

60. At the ensuing meeting, Defendant Janjigian stated in substance that Bolyasnyy was backing out of a deal under which payment of the $25,000 incentive had been conditioned. Bolyasnyy understood Keithly to state that, because Bolyasnyy had threatened legal action, the MTBA wanted a legal agreement in connection with the payment.

61. Bolyasnyy objected that a statutorily-based incentive program should not be conditioned on a release of claims, acknowledgment, confidentiality restriction, or cessation of criticism. The MTBA did not make the payment.

62. The MTBA's willingness in March 2026 to discuss paying Danzing Candy the same $25,000 incentive Cramer had described as fully allocated by that point supports the inference that the incentive remained available for Danzing Candy, or that the MTBA retained authority to make the payment, and that the earlier explanation was incomplete, misleading, or inconsistently applied.

63. On July 10, 2026, Bolyasnyy sent Keithly and other directors a written request for an explanation of alleged conflicts and disparities concerning mare placements, incentive-supported benefits, and related commercial interests. The materials available to Plaintiffs contain no substantive correction of the allocation concerns or complete disclosure of the recipient and payment information requested. In September 2026, Bolyasnyy received reports that persons

associated with him had been discussed as potentially being barred from running for office or otherwise participating in the MTBA.

**Plaintiffs' injury**

64. Had the 2026 program been timely and accurately disclosed, Plaintiffs would have sought the $25,000 Danzing Candy stallion incentive, pursued any available incentive for Antarah, adjusted their mare-acquisition strategy to pursue qualifying mares in foal, and used the mare incentives to market Danzing Candy and Antar's Farm.

65. As a result of the challenged conduct, Plaintiffs lost incentive opportunities, mare placements, stud fees, breeding and foaling business, related farm-services revenue, and goodwill. The most readily identifiable direct incentive loss is the disputed $25,000 Danzing Candy payment; additional losses will be established through discovery and competent evidence.

66. After Danzing Candy received little meaningful third-party breeding business in Massachusetts during the 2026 season, Plaintiffs arranged for him to stand in Ohio during the 2027 breeding season while maintaining their Massachusetts farm and other breeding operations.

**The challenged conduct affected competition and interstate commerce**

67. Plaintiffs compete to provide thoroughbred stallion breeding services to mare owners and breeders. Massachusetts is commercially distinct for mare owners seeking program-supported breeding opportunities because eligibility for the program's benefits depended on Massachusetts placement, foaling, registration, and breed-back activity. The program itself was designed to influence placement decisions by rewarding qualifying horses brought into or kept in Massachusetts.

68. Those program conditions changed the net economics of choosing among Massachusetts stallions. Stallion owners compete for mare placements, stud fees, future progeny

awards, reputation, and repeat breeding business, while associated farms also receive foaling and other service revenue.

69. Mare owners choose among stallions based on pedigree, racing and progeny performance, stud fees, location, related farm services, promotion, and economic incentives. By offering up to $15,000 per qualifying mare and $25,000 per qualifying stallion, the 2026 program could considerably change the effective economics of breeding in Massachusetts and the relative attractiveness of competing stallions.

70. The MTBA exclusively controlled the 2026 program and the information necessary to participate in it, serving as the sole source of the program's incentive payments.

71. That control gave the MTBA the practical ability to alter the relative economic terms on which Massachusetts stallions competed for mares and related breeding business.

72. Under the MTBA bylaws, expenditures exceeding $5,000 required a two-thirds vote of the quorum. Because each stallion incentive was $25,000 and Cramer represented that the five allocations had been approved by the board, the award allocations themselves necessarily involved collective board authorization if Cramer's account was accurate.

73. The restraint challenged here is Defendants' alleged agreement and concerted conduct in selectively disclosing the program, using undisclosed or shifting criteria, restricting access to incentive benefits and promotion, and directing the resulting breeding opportunities toward favored or incumbent interests.

74. The August 27, 2025 board action establishes collective board action adopting the program rules. Cramer later told Bolyasnyy that he was obtaining and confirming program details from "the board," then supplied the Second Version as the program presented to and

approved by the board; the MTBA later addressed the disputed $25,000 payment at a board meeting.

75. Together, those facts support the inference that the challenged administration reflected board-level conduct.

76. On information and belief, the Director Defendants who were voting directors during implementation authorized, participated in, ratified, or knowingly carried out the challenged program practices.

77. Keithly later personally participated in the MTBA's handling of Plaintiffs' disputed $25,000 payment and in program-related communications while maintaining competing breeding interests.

78. Danzing Candy represented a significant new competitive market entrant. Selective denial of program access required Plaintiffs to compete for mares on less favorable incentive economics than informed or favored participants, increasing Plaintiffs' effective cost of attracting mares, diverting mare placements and related revenue, and impairing Danzing Candy's ability to establish a Massachusetts book of mares.

79. The challenged effects extended beyond Plaintiffs' lost benefits. On information and belief, incentive-supported breeding opportunities became concentrated among incumbent or favored interests, and mare owners encountered competing stallions on unequal economic terms, reducing their competitive choices in the Massachusetts market.

80. It also contributed to Plaintiffs' decision to stand Danzing Candy outside Massachusetts for the following breeding season.

81. The relevant commerce included interstate movement of horses, breeding customers, racing and breeding interests, and payments, and the 2026 program itself rewarded owners for bringing qualifying breeding stock into Massachusetts.

82. The challenged conduct was therefore within the flow of interstate commerce or had a substantial effect on interstate commerce.

83. The challenged selective disclosure, allocation, and implementation reflected the MTBA's discretionary decisions concerning how the 2026 program would operate.

## COUNT I
## FRAUD AND INTENTIONAL MISREPRESENTATION AGAINST THE MTBA AND DAVID CRAMER

84. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

85. The fraud claim arises from two related periods in which the MTBA, acting through Cramer and other representatives, and Cramer individually supplied misleading information or partial disclosures concerning the 2026 program.

86. In October 2025, Cramer, who had attended the August 27 board meeting at which the program was presented and voted on, and Umbrello discussed Plaintiffs' prospects for attracting mares and MTBA promotional assistance, represented or suggested that Plaintiffs could expect mares, and omitted the recently approved incentive program even though its mare, breed-back, and stallion payments directly affected those breeding decisions.

87. At that time, Plaintiffs remained positioned to act. Danzing Candy had arrived before the First Version's February 1 cutoff date, Plaintiffs were considering mares in foal before December 15, reduced mare incentives remained available afterward, and Plaintiffs were ready and able to submit the required paperwork.

88. Plaintiffs reasonably relied on the October communications and omissions by deciding to keep Danzing Candy in Massachusetts, making mare-acquisition and promotional decisions without the program information, and failing to seek timely consideration for Danzing Candy and available mare incentives.

89. After Bolyasnyy independently learned of the program, he specifically requested the operative terms, allocation process, dissemination process, and recipients. Cramer then represented that the available stallion funds had been allocated and approved by the board before the MTBA met Plaintiffs and that Plaintiffs had missed the opportunity to participate.

90. On February 13, 2026, Cramer supplied the more restrictive Second Version and represented that it was the program "as it was presented and approved by the board," including the statements that only five stallions had been approved and all five were allocated by September 15, 2025. The Second Version also omitted the First Version's reduced incentive for mares arriving after December 15, 2025.

91. Those February representations were false or misleading under alternative factual theories. If the First Version governed, the Second Version added limitations and criteria absent from the operative terms. If the Second Version governed, the August 27 minutes, October 16 application review, and March 2026 discussion of paying Danzing Candy the disputed $25,000 undermine the categorical explanation that Plaintiffs had missed the opportunity to participate.

92. By discussing Plaintiffs' breeding plans and promotional prospects in October, responding to Plaintiffs' specific program requests in February, and undertaking to obtain and confirm information from the board, the MTBA and Cramer undertook to speak accurately and completely about information within their control.

93. Cramer had attended the August 27 board meeting at which the program was presented and voted on and later told Bolyasnyy that he was obtaining and confirming information from "the board." The MTBA and Cramer knew, or recklessly disregarded, that the representations and omissions were false, incomplete, or misleading.

94. The MTBA and Cramer intended that Plaintiffs rely on the information they supplied or withheld in making breeding and investment decisions.

95. Plaintiffs relied on the February representations by refraining from pressing available program opportunities and associated breeding business. As a direct and proximate result of the October and February conduct, Plaintiffs suffered lost incentive opportunities, mare placements, stud fees, farm revenue, breeding opportunities, and related pecuniary loss.

## COUNT II
## NEGLIGENT MISREPRESENTATION AGAINST THE MTBA AND DAVID CRAMER

96. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

97. In the alternative to Count I, the MTBA and Cramer supplied false, inaccurate, incomplete, or misleading information concerning the 2026 program for Plaintiffs' guidance in breeding, acquisition, promotion, and investment decisions, in the course of the MTBA's program administration and Cramer's role as an MTBA director and representative.

98. Cramer undertook to obtain and confirm that information from the MTBA board before providing it to Plaintiffs, but the MTBA and Cramer failed to exercise reasonable care or competence in obtaining, confirming, or communicating it.

99. Plaintiffs reasonably relied on that information in deciding whether to continue pursuing program benefits and associated breeding opportunities and suffered the pecuniary losses alleged above.

**COUNT III**
**INTERFERENCE WITH ADVANTAGEOUS ECONOMIC RELATIONS AGAINST THE MTBA**

100. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

101. Plaintiffs had existing and prospective advantageous economic relationships with mare owners, breeders, farm customers, and other participants in the thoroughbred breeding industry, including relationships arising from Danzing Candy's availability as a Massachusetts stallion and Antar's Farm's breeding services.

102. The MTBA knew of those relationships and prospective relationships. Its representatives knew that Plaintiffs were actively soliciting mares, promoting Danzing Candy, purchasing broodmares, and attempting to build a Massachusetts breeding business.

103. The MTBA also knew that the availability of mare and stallion incentives would directly affect where mare owners placed mares, which stallions they selected, and which farms received associated breeding and foaling business.

104. The MTBA knowingly interfered with Plaintiffs' advantageous economic relations by selectively withholding the program and promotional access, relying on inconsistent or undisclosed program terms, representing that funding was unavailable, and directing program-supported breeding opportunities toward other market participants.

105. The interference was improper because it was accomplished through misrepresentations, nondisclosures, inconsistent criteria, arbitrary or conflicted administration, and preferential treatment of competing or favored interests.

106. As a direct and proximate result, Plaintiffs lost mare placements, stud fees, breeding and farm-service opportunities, incentive payments, and goodwill.

**COUNT IV**
**VIOLATION OF G. L. c. 93A, § 11 AGAINST THE MTBA, CRAMER, UMBRELLO, AND KEITHLY**

107. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

108. Plaintiffs engaged in trade or commerce by operating Antar's Farm, standing thoroughbred stallions, soliciting mare owners and breeders, purchasing broodmares, offering breeding and farm services, and seeking stud fees and related revenue.

109. The MTBA engaged in trade or commerce by exercising its own discretion over the 2026 program's terms, eligibility criteria, commercially valuable information, promotional access, recipients, and substantial economic benefits among competing private breeders, stallion owners, mare owners, and farms.

110. Those discretionary choices affected which private businesses could access incentives and promotional channels that influenced mare placement, breeding opportunities, and related revenue.

111. Cramer, Umbrello, and Keithly also participated in private thoroughbred racing or breeding activities and allegedly used, participated in, or benefited from MTBA authority in a commercial setting affecting competing breeding businesses.

112. The MTBA committed unfair or deceptive acts or practices by concealing or selectively disclosing the program, relying on conflicting rules, misrepresenting the availability and allocation of funds, applying undisclosed or shifting criteria, and withholding selection and recipient information.

113. The MTBA also committed unfair methods of competition by using selective program disclosure, promotional access, and discretionary incentive administration to alter the relative economic terms on which competing stallions and farms solicited mares, permitting

conflicted decision making and directing incentive-supported breeding opportunities toward favored participants while Plaintiffs competed without equivalent information or access.

114. Cramer personally participated in the deceptive conduct through his communications and representations concerning the exhaustion of funds, Plaintiffs' supposed missed opportunity, and the status of the Second Version as the board-approved program.

115. Umbrello personally participated in the challenged conduct by discussing Plaintiffs' breeding plans, visiting Antar's Farm, requesting postponement of Plaintiffs' open house, and failing to disclose the program while Plaintiffs were making commercially significant breeding decisions.

116. Keithly personally participated in the challenged conduct through his alleged influence over incentive-supported breeding opportunities and his participation in the later discussions concerning payment of the disputed $25,000 incentive while maintaining private breeding interests that competed with Plaintiffs for mares and related revenue.

117. The challenged acts, communications, commercial effects, and injuries occurred primarily and substantially within Massachusetts.

118. As a direct and proximate result of the unfair or deceptive acts and unfair methods of competition, Plaintiffs suffered a loss of money or property, including lost incentive opportunities, mare placements, stud fees, farm revenue, breeding opportunities, and goodwill.

119. The violations were knowing and willful to the extent Defendants knew of the inconsistent program terms, Plaintiffs' commercial plans, the economic significance of the information supplied or withheld, and the preferential commercial effects of the challenged practices and nevertheless continued them.

120. Plaintiffs are entitled to actual damages, double or treble damages to the extent authorized by G. L. c. 93A, § 11, reasonable attorneys' fees and costs, and other relief authorized by law.

## COUNT V
## DECLARATORY JUDGMENT AGAINST THE MTBA

121. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

122. An actual controversy exists between Plaintiffs and the MTBA concerning the operative terms and administration of the 2026 breeding incentive program and Plaintiffs' right to seek or receive program benefits.

123. Plaintiffs contend that the MTBA failed to disclose the program meaningfully, relied on conflicting guidelines, applied undisclosed or retroactive criteria, and denied Plaintiffs a fair opportunity to seek the benefits for which they otherwise could have been considered.

124. The MTBA has not paid the disputed $25,000 Danzing Candy incentive, has denied or failed to recognize Plaintiffs' position concerning the 2026 program, and has not provided a complete explanation reconciling the different program versions and the timing of award approvals.

125. Plaintiffs are entitled to a declaration identifying the operative 2026 program terms governing Danzing Candy's eligibility and determining whether the MTBA may continue withholding the disputed $25,000 based on criteria or deadlines that were undisclosed while Plaintiffs could act.

## COUNT VI
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, AGAINST ALL DEFENDANTS

126. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

127. Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain interstate trade or commerce.

128. The MTBA is an association through which economically interested participants in the thoroughbred industry jointly made and implemented rules governing access to a competitively significant breeding incentive program.

129. MTBA rules required directors to hold independent financial interests in thoroughbred ownership or farm services. Multiple Director Defendants maintained private racing, breeding, stallion, mare, or farm-service interests outside their MTBA roles and competed directly or indirectly for breeding-related revenue and opportunities.

130. The August 27 board vote, the bylaw requiring collective approval for expenditures exceeding $5,000, Cramer's representation that the five $25,000 stallion allocations were board-approved, his later consultation with "the board," and the board's handling of Plaintiffs' disputed payment support the inference that the challenged program rules and allocations reflected concerted board action.

131. Plaintiffs challenge the alleged agreement and concerted conduct to withhold or selectively disclose program information concerning eligibility, deadlines, and awards, apply undisclosed or shifting criteria, deny Plaintiffs equal access to incentive benefits and promotion, and direct resulting breeding business toward favored or incumbent commercial interests.

132. That conduct constituted a concerted exclusionary restraint because competing economic actors allegedly used collective control over an association-administered commercial benefit to impede a new competitor's access to economically significant incentives and the customers those incentives were designed to attract.

133. The relevant product market is thoroughbred stallion breeding services. Massachusetts is the relevant geographic market for mare owners seeking program-supported breeding opportunities because eligibility for the program's benefits depended on Massachusetts placement, foaling, registration, and breed-back activity, and those benefits changed the net economics of choosing among Massachusetts stallions. Out-of-state stallion breeding services could not supply the same Massachusetts-specific incentives.

134. Defendants, acting through the MTBA, possessed at least a threshold degree of market power in that market. In addition to the Director Defendants being active market participants, the MTBA was the sole source of payments of up to $15,000 per qualifying mare and $25,000 per qualifying stallion, together with eligibility information and access to MTBA promotional channels. The Commonwealth's statutory scheme expressly uses breeding incentives to promote and encourage Massachusetts thoroughbred breeding, and those payments changed the net economics of choosing among Massachusetts stallions.

135. That control gave Defendants the practical ability to influence mare demand among competing Massachusetts stallions, including stallions affiliated with certain Director Defendants.

136. The challenged restraint had substantial anticompetitive effects in the alleged market by denying Plaintiffs access to a significant competitive input while favored participants could use the subsidies, increasing Plaintiffs' effective cost of attracting mares, diverting mare placements and revenue, reducing mare owners' choice among competing Massachusetts stallions, and impairing Danzing Candy's ability to establish a Massachusetts book of mares.

137. The restraint also tended to protect incumbent or favored breeding interests from competition by a stallion with a substantial prior racing and progeny record while concentrating incentive-supported opportunities among existing market participants.

138. Plaintiffs allege that the challenged agreement was an unreasonable restraint of trade.

139. The agreement and its implementation occurred in interstate commerce or substantially affected interstate commerce because thoroughbred horses, customers, racing and breeding businesses, and payments crossed state lines and because the challenged program influenced interstate decisions about where horses would stand, foal, breed, and race, including by rewarding qualifying breeding stock brought into Massachusetts.

140. Plaintiffs suffered antitrust injury through lost mare placements, breeding customers, stud fees, farm services, and market-entry opportunities caused by the alleged collective restriction of access to the program benefits used to attract those customers.

141. Plaintiffs are entitled to recover damages and reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15.

**COUNT VII**
**VIOLATION OF G. L. c. 93, §§ 4 AND 12, AGAINST ALL DEFENDANTS**

142. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

143. For the reasons alleged above, Defendants entered into, participated in, implemented, or ratified a contract, combination, or conspiracy that unreasonably restrained competition in Massachusetts thoroughbred stallion breeding services, in violation of G. L. c. 93, § 4.

144. The challenged program governed Massachusetts stallions, foaling and breed-back activity, farms, and MTBA-controlled payments intended to influence breeding activity

within the Commonwealth, and its principal competitive effects occurred in Massachusetts. No statute, regulation, or agency directive required the selective disclosure, shifting criteria, preferential access, or conflicted allocation practices challenged here; Defendants selected and implemented those practices through their own administration of the program.

145. Plaintiffs were injured in their business or property by the alleged restraint, including through lost mare placements, stud fees, breeding and farm-services business, and impairment of their competitive position.

146. Plaintiffs are entitled to the relief authorized by G. L. c. 93, § 12.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Maksim Bolyasnyy and Antar's Amazing Dream Farm, LLC demand judgment in their favor and against Defendants as follows:

A. For compensatory and actual damages in an amount to be determined at trial;

B. For a declaration identifying the operative 2026 program terms governing Danzing Candy's eligibility and determining whether the MTBA may continue withholding the disputed $25,000 based on criteria or deadlines that were undisclosed while Plaintiffs could act;

C. For damages, including treble damages as authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15, on Plaintiffs' federal antitrust claim;

D. For actual damages and any enhanced damages authorized by G. L. c. 93, § 12;

E. For actual damages and double or treble damages to the extent authorized by G. L. c. 93A, § 11;

F. For reasonable attorneys' fees and costs as authorized by the Clayton Act, G. L. c. 93, G. L. c. 93A, and other applicable law;

G. For such further declaratory relief as may be necessary to effectuate the Court's judgment;

H. For prejudgment interest, post-judgment interest, costs, and such other and further relief as this Court deems just and proper, without duplicative recovery.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

**MAKSIM BOLYASNYY and ANTAR'S AMAZING DREAM FARM, LLC**
By their attorneys,

/s/ Alexander R. Zwillinger
_______________________________

Alexander R. Zwillinger, BBO# 687078
arzwillinger@colelp.com
Riley S. Odams, BBO# 715558
rsodams@colelp.com
COLE LAW PARTNERS, P.C.
100 Cambridge Street, 14th Floor
Boston, MA 02114
(p) (617) 356-0606

Date: October 6, 2026